IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| BH MEDIA GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 7:18cv388 |
| | ) | |
| ANDY BITTER, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

Defendant Andy Bitter ("Bitter"), through counsel, answers the Complaint filed by Plaintiff BH Media Group, Inc. ("BH Media") as follows:

**GENERAL DENIAL**

Except as otherwise stated herein, Bitter denies (i) each and every allegation in the Complaint, including without limitation any allegations contained in the headings, subheadings, and footnotes of the Complaint; and (ii) any liability to Plaintiff.

1.      Bitter denies that Plaintiff states a claim for any of the causes of action listed in Paragraph 1.

2.      Bitter admits the allegations in Paragraph 2.

3.      Bitter admits the allegations in Paragraph 3.

4.      Paragraph 4 is a legal conclusion to which no response is required.  To the extent a response is required, the allegations in Paragraph 4 are denied.

5.      Paragraph 5 is a legal conclusion to which no response is required.  To the extent a response is required, the allegations in Paragraph 5 are denied.

6.      Paragraph 6 is a legal conclusion to which no response is required.  To the extent a response is required, the allegations in Paragraph 6 are denied.

7. Paragraph 7 is a legal conclusion to which no response is required. To the extent a response is required, the allegations in Paragraph 7 are denied.

8. Bitter is without sufficient information to admit or deny the allegations contained in Paragraph 8 and therefore denies them on that basis.

9. Bitter is without sufficient information to admit or deny the allegations contained in Paragraph 9 and therefore denies them on that basis.

10. Bitter denies the allegations in Paragraph 10.

11. Bitter denies the allegations in Paragraph 11.

12. Bitter admits that Tucker ended his employment with the Virginian-Pilot (the "Pilot") in August 2011. Bitter denies the remaining allegations in Paragraph 12.

13. Bitter admits that he was hired by the Pilot in October of 2011. Bitter is without sufficient information to admit or deny the remaining allegations in Paragraph 13 and therefore denies them on that basis.

14. Bitter admits that Kyle Tucker ("Tucker") provided access and login information for his personal Twitter account, and gave that account directly to Bitter in October of 2011. Since receiving access to and login information from Tucker, no person other than Bitter has accessed or controlled Bitter's Twitter account. Neither the Roanoke Times nor the Pilot ever owned or controlled Bitter's Twitter account. Bitter denies all other allegations in Paragraph 14.

15. Bitter admits that since taking over the Twitter account formerly owned by Tucker, he has updated the user name and password. Bitter denies all other allegations in Paragraph 15.

16. Bitter denies the allegations in Paragraph 16.

17. Bitter denies the allegations in Paragraph 17.

18. Bitter denies the allegations in Paragraph 18.

19.     Bitter denies the allegations in Paragraph 19.

20.     Bitter denies the allegations in Paragraph 20.

21.     Bitter is without sufficient information to admit or deny the allegations contained in Paragraph 21 and therefore denies them on that basis.

22.     Bitter is without sufficient information to admit or deny the allegations contained in Paragraph 22 and therefore denies them on that basis.

23.     Bitter is without sufficient information to admit or deny the allegations contained in Paragraph 23 and therefore denies them on that basis.

24.     Bitter denies the allegations in Paragraph 24.

25.     Bitter admits that on or about June 22, 2018, he notified the Roanoke Times that he intended to resign effective July 6, 2018.  Bitter admits that he notified the Roanoke Times that he was leaving to work for The Athletic Media Company ("The Athletic").  Bitter denies all other allegations in Paragraph 25.

26.     Bitter admits that BH Media has recently, for the first time, attempted to assert a claim of ownership over Bitter's Twitter account.  Bitter denies all other allegations in Paragraph 26.

27.     Bitter admits he has refused to give access to his Twitter account to BH Media, because it does not, and never has, belonged to BH Media.  Bitter denies the remaining allegations in Paragraph 27.

28.     Bitter admits that he continues to use his Twitter account.  Bitter denies all other allegations in Paragraph 28.

29.     Bitter admits that he posted information on his Twitter account about his move to The Athletic.  Bitter denies all other allegations in Paragraph 29.

30.     Bitter admits that he received a letter from BH Media on July 11, 2018 purporting to assert an interest in Bitter's Twitter account.  All other allegations in Paragraph 30 are denied.

31.     Bitter admits that he continues to use his Twitter account.  Bitter denies all other allegations in Paragraph 31.

32.     Bitter incorporates his responses to Paragraphs 1-31 of the Answer.

33.     Bitter denies the allegations in Paragraph 33.

34.     Bitter admits that his Twitter account has followers from other states and countries. Bitter denies the remaining allegations in Paragraph 34.

35.     Bitter denies the allegations in Paragraph 35.

36.     Bitter denies the allegations in Paragraph 36.

37.     Bitter denies the allegations in Paragraph 37.

38.     Bitter denies the allegations in Paragraph 38.

39.     Bitter denies the allegations in Paragraph 39.

40.     Bitter denies the allegations in Paragraph 40.

41.     Bitter denies the allegations in Paragraph 41.

42.     Bitter denies the allegations in Paragraph 42.

43.     Bitter denies the allegations in Paragraph 43.

44.     Bitter denies the allegations in Paragraph 44.

45.     Bitter denies the allegations in Paragraph 45.

46.     Bitter denies the allegations in Paragraph 46.

47.     Bitter incorporates his responses to Paragraphs 1-46 of the Answer.

48.     Bitter denies the allegations in Paragraph 48.

49.     Bitter denies the allegations in Paragraph 49.

50.     Bitter denies the allegations in Paragraph 50.

51.     Bitter denies the allegations in Paragraph 51.

52.     Bitter denies the allegations in Paragraph 52.

53.     Bitter denies the allegations in Paragraph 53.

54.     Bitter denies the allegations in Paragraph 54.

55.     Bitter denies the allegations in Paragraph 55.

56.     Bitter incorporates his responses to Paragraphs 1-55 of the Answer.

57.     Paragraph 57 is a legal conclusion to which no response is required. To the extent a response is required, the allegations in Paragraphs 57 are denied.

58.     Bitter denies the allegations in Paragraph 58.

59.     Bitter denies the allegations in Paragraph 59.

60.     Bitter denies the allegations in Paragraph 60.

61.     Bitter admits that he continues to use his Twitter account. Bitter denies all other allegations in Paragraph 61.

62.     Bitter denies the allegations in Paragraph 62.

63.     Bitter denies the allegations in Paragraph 63.

64.     Bitter incorporates his responses to Paragraphs 1-63 of the Answer.

65.     Paragraph 65 is a legal conclusion to which no response is required. To the extent a response is required, the allegations in Paragraphs 65 are denied.

66.     Bitter denies the allegations in Paragraph 66.

67.     Bitter denies the allegations in Paragraph 67.

68.     Bitter denies the allegations in Paragraph 68.

69.     Bitter denies the allegations in Paragraph 69.

70.     Bitter incorporates his responses to Paragraphs 1-69 of the Answer.

71.     Paragraph 71 is a legal conclusion to which no response is required.  To the extent a response is required, the allegations in Paragraphs 71 are denied.

72.     Bitter denies the allegations in Paragraph 72.

73.     Bitter denies the allegations in Paragraph 73.

74.     Bitter denies the allegations in Paragraph 74.

75.     Bitter admits that he has accessed and posted to his Twitter account since he ended his employment with BH Media.  Bitter denies the remaining allegations in Paragraph 75.

76.     Bitter denies the allegations in Paragraph 76.

77.     Bitter admits that he did not comply with BH Media's wrongful attempt to assert control of and an interest in his Twitter account.  Bitter denies all other allegations in Paragraph 77.

78.     Bitter denies the allegations in Paragraph 78.

79.     Bitter denies the allegations in Paragraph 79.

80.     Bitter denies the allegations in Paragraph 80.

81.     Bitter denies the allegations in Paragraph 81.

82.     Bitter denies the allegations in Paragraph 82.

83.     Bitter incorporates his responses to Paragraphs 1-82 of the Answer.

84.     Bitter denies the allegations in Paragraph 84.

85.     Bitter denies the allegations in Paragraph 85.

86.     Bitter admits that he has refused to give his Twitter account to BH Media in response to BH Media's wrongful attempts to assert control of and an interest in his Twitter account.  Bitter also admits that he received a letter from BH Media on July 11, 2018 demanding

that he give up his Twitter account and login information. All other allegations in Paragraph 86 are denied.

87. Bitter admits that he has refused to give his Twitter account to BH Media in response to BH Media's wrongful attempts to assert control of and an interest in his Twitter account. All other allegations in Paragraph 87 are denied.

88. Bitter denies the allegations in Paragraph 88.

89. Bitter denies the allegations in Paragraph 89.

90. Bitter denies the allegations in Paragraph 90.

91. Bitter denies the allegations in Paragraph 91.

92. Bitter incorporates his responses to Paragraphs 1-91 of the Answer.

93. Bitter denies that he owes BH Media any duty as to proprietary and confidential information provided to him by entities or individuals other than BH Media.

94. Bitter denies the allegations in Paragraph 94.

95. Bitter denies the allegations in Paragraph 95.

96. Bitter denies the allegations in Paragraph 96.

97. Bitter denies the allegations in Paragraph 97.

98. Bitter denies that Plaintiff is entitled to any of the relief sought in its Complaint.

## AFFIRMATIVE DEFENSES

As additional defenses to the Complaint, and without suggesting or conceding that he has the burden of proof on any such defenses, Bitter alleges as follows:

1. Plaintiff's Complaint fails to state a claim on which relief can be granted.

2. Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands.

3. Plaintiff's claims are barred in whole or in part by the statute of limitations.

4. Plaintiff's claims are barred in whole or in part by the doctrine of laches.

5. Defendant violated no legal duty with respect to Plaintiff.

6. Plaintiff's claims are barred in whole or in part because it does not own, nor has it ever owned, the Account or any derivative rights at issue in this lawsuit.

7. Plaintiff's claims are barred in whole or in part because Plaintiff sustained no damages.

8. Plaintiff's claims are barred in whole or in part because Plaintiff suffered no injury.

9. Plaintiff's claims are barred in whole or in part because Plaintiff has failed to mitigate damages.

10. Plaintiff's claims are barred in whole or in part because Plaintiff expressly or impliedly consented to Bitter's conduct.

11. Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

12. Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

13. Plaintiff's claims are barred in whole or in part by the doctrine of acquiescence.

14. Plaintiff's claims are barred in whole or in part because Plaintiff lacks standing to assert any claims.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Bitter hereby demands a trial by jury for all issues triable to a jury.

## ADDITIONAL DEFENSES

To the extent Bitter may have additional defenses available that are not fully known and of which Bitter is not presently aware, Bitter reserves the right to raise and assert additional defenses (and counterclaims including malicious prosecution and abuse of process) or seek sanctions against BH Media and/or its counsel for filing a frivolous lawsuit when they are ascertained.

WHEREFORE, Bitter respectfully requests the Court enter an Order:

a.      Dismissing Plaintiff's Complaint in its entirety with prejudice;

b.      Entering judgment in Bitter's favor;

c.      Awarding Bitter his fees and costs incurred since the commencement of this litigation;

d.      Awarding any other relief the Court deems just and proper.

9

## COUNTERCLAIM

Counterclaim Plaintiff Andy Bitter ("Bitter"), by counsel, in support of his Counterclaim against BH Media Group, Inc. ("BH Media") for defamation (the "Counterclaim"), states as follows:

## THE PARTIES

1. Bitter is an individual residing in Christiansburg, Virginia.

2. BH Media is a Delaware corporation with its principal place of business in Omaha, Nebraska.

## NATURE OF THE ACTION

3. This defamation action arises out of BH Media's publication of an article in the Roanoke Times on August 7, 2018 titled "Roanoke Times sues former sportswriter over continued use of Twitter account" (the "Article"). The Article purported to detail a complaint BH Media filed against Bitter on August 6, 2017 (the "Complaint"). BH Media's Complaint tells a fascinating tale in which one of its key intellectual property assets was taken from it without its consent. But there's a fatal deficiency in all of its claims: the entire Complaint is based on BH Media's alleged "ownership" of the Twitter account at issue (the "Account"), yet BH Media does not, and never did, own the Account. BH Media did not create the Account, never acquired it through an assignment, and never controlled it. Far from being the sympathetic victim of an ex-employee gone rogue, BH Media is a bully attempting to intimidate a former writer into giving it something that belongs to him.

4. As owner of the Roanoke Times, BH Media published the Article not as a media organization reporting on issues of interest to its readership, but as a vindictive former employer actively engaged in the litigation and acting with malice toward Bitter. Moreover, the Article was

10

not a fair or substantially accurate account of the Complaint, because it contained additional statements found nowhere in the Complaint regarding how Bitter allegedly acquired the Account, and when BH Media allegedly demanded its return. BH Media and its management, including the Roanoke Times's Executive Editor Lawrence McConnell, knew these statements were demonstrably false when it published the Article. Nevertheless, BH Media published the Article with reckless disregard of its falsity, and for the purpose of impugning Bitter's integrity and injuring him in his profession as a sportswriter covering Virginia Tech athletics. For this reason, and for the additional reasons alleged below, Bitter files this Counterclaim to hold BH Media to account for its defamatory conduct.

## JURISDICTION & VENUE

5. Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Bitter and BH Media, and Bitter seeks damages in excess of $75,000. The Court also has supplemental jurisdiction over this state law counterclaim pursuant to 28 U.S.C. § 1367(a).

6. The Court has personal jurisdiction over BH Media because it has chosen to sue Bitter in this Court, because the cause of action in this Counterclaim arises from BH Media's transaction of business in Virginia, and because BH Media has caused Bitter tortious injury in Virginia while regularly conducting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods and services sold in Virginia.

## STATEMENT OF FACTS

7. Bitter has covered college athletics as a reporter for the past twenty years. As a student reporter at the University of Wisconsin, he covered the school's sports teams before graduating with a degree in journalism. He then moved to Virginia, and spent the next seven years

covering sports including college football for newspapers in Danville and Lynchburg. Bitter left Virginia to cover Auburn University athletics for a newspaper in Columbus, Georgia, before returning three years later to cover Virginia Tech athletics full time for the Virginian-Pilot (the "Pilot") and the Roanoke Times, which were under joint ownership at the time. Although Bitter was a sportswriter at both newspapers, his position rested with the Pilot. Bitter has lived in the New River Valley since he started at the Pilot and is currently a resident of Christiansburg, Virginia.

8.      Bitter began working for the Pilot as a sportswriter covering Virginia Tech in October 2011. Although the Pilot is headquartered in Norfolk, Virginia, Bitter's position was based in Blacksburg so the Pilot could provide focused coverage of Virginia Tech sports to its readers.

9.      At the Pilot, Bitter wrote articles about Virginia Tech sports for publication in the Pilot's online and print editions, as well as posts on the Pilot's Virginia Tech Insider blog. This content also appeared in the print and online editions of the Roanoke Times. The Pilot did not require Bitter to maintain any social media account.

10.     Before Bitter began working at the Pilot, Kyle Tucker ("Tucker") covered Virginia Tech sports at the Pilot for seven years. Tucker also wrote articles about Virginia Tech sports for the Pilot's online and print editions, and blog posts for the Pilot's Virginia Tech Insider blog. Tucker left the Pilot to cover University of Kentucky athletics for a newspaper in Louisville, Kentucky in August 2011.

11.     While he worked at the Pilot, Tucker created a Twitter account (the "Account") personally and of his own volition. The Pilot did not ask Tucker to create the Account. Although Tucker created the Account while he worked at the Pilot, the Pilot did not require him to open the

Account or condition his employment in any way on the Account. Tucker did not share the Account's password with the Pilot at any time, and Tucker alone maintained the Account. Tucker never assigned, licensed, or sold the Account to the Pilot.

12. Tucker used the Account to communicate with other Twitter accounts who chose to follow the Account. The Account identified "Kyle Tucker" as the author of all communications from the Account.

13. Tucker provided personal insights, opinions, and comments about a variety of topics other than Virginia Tech athletics to his followers. Tucker also posted insights, opinions, and comments about Virginia Tech athletics other than those he included in articles and blog posts that he wrote for the Pilot. For some of these articles and blog posts, Tucker used the Account to send links to his followers.

14. Tucker was the sole owner of the Account. Tucker did not grant any ownership interest in the Account to the Pilot. He never provided the Pilot with access to the Account, or the password for the Account at any time.

15. When Tucker left the Pilot in August 2011, he maintained ownership of the Account and did not relinquish his ownership of the Account to the Pilot or anyone else.

16. On October 4, 2011, Tucker sent an email from his personal gmail account to Bitter's personal gmail account. Within the email, Tucker offered to give ownership of the Account to Bitter. Tucker provided Bitter with the password to the Account, and directions on how to change the username of the account so it would no longer be associated with Tucker.

17. Tucker granted ownership in the Account directly to Bitter. Tucker did not grant any ownership in the Account to the Pilot through this transfer. The Account was exchanged solely through Tucker's and Bitter's personal email addresses, and Bitter's employment at the Pilot was

not conditioned upon him using the Account. Tucker gave Bitter the account to help Bitter as he began covering Virginia Tech athletics, and to provide the follower base Tucker alone had cultivated with content about Virginia Tech athletics. Tucker did not believe that Virginia Tech fans would be interested in his tweets about Kentucky sports and would rather continue to receive updates on Virginia Tech sports from Bitter. Had Tucker wanted to keep the Account, he would have been free to do so, because it was his property and his alone.

18.     Bitter accepted ownership of the Account from Tucker and began using the Account in October 2011. Bitter changed the username of the account to andybittervt and identified himself, "Andy Bitter," as the author of all communications from the Account.

19.     When Bitter became the sole owner of the Account, it had less than 4,000 followers. Over the last seven years, Bitter has worked tirelessly to grow the Account to its current total of over 27,600 followers. Since receiving the Account, Bitter alone has maintained the Account and no one other than Bitter has accessed or posted to the Account. Bitter alone has maintained control of the Account's password and he has not shared it with any other party.

20.     Bitter grew the Account through his own efforts. He built a readership among fans of Virginia Tech athletics and college football generally by posting personal insights, opinions, and comments. Bitter posts about Virginia Tech athletics and college football, but he also posts about completely unrelated matters. In fact, many of Bitter's most "liked" tweets are about being a father.

21.     Bitter's articles and blog posts have appeared on the Roanoke Times platforms since he began covering Virginia Tech athletics full-time in October 2011 as an employee of the Pilot. At that time, Landmark Media Enterprises, LLC ("Landmark") owned both the Pilot and the Roanoke Times and maintained the two newspapers as completely separate entities. Neither

Bitter's employment offer letter from the Pilot, nor any subsequent agreement, assigned ownership of the Account to the Pilot or granted the Pilot any rights whatsoever in the Account. In 2013, BH Media purchased the Roanoke Times from Landmark. Bitter chose to become an employee of BH Media at a later date – January 1, 2014 – and worked for BH Media until July 6, 2018.

22.      Although Bitter used the Account to send out links to articles and blog posts which appeared on the Roanoke Times platforms over the past seven years, at no point did the Pilot or BH Media require Bitter to do this as part of his job duties.

23.      Bitter has never provided the password for the Account to any employee or representative of BH Media or anyone else. BH Media has never directed Bitter to protect the password of the Account, or told Bitter to take any steps to prevent any other person from accessing the Account. Bitter is the only person who has had access to the Account at all, and Bitter's decision to restrict access to the Account was made by Bitter alone as the sole owner of the Account.

24.      No employee of BH Media other than Bitter has ever posted to the Account, or used it to communicate with the Account's followers. BH Media has never requested or received access to any direct message from the Account. Bitter alone has sent and received direct messages from the Account.

25.      BH Media has never exercised any editorial control over the content of the Account.

26.      BH Media has never had any input into a decision about any account that the Account follows. Bitter alone has made all decisions about whether to follow any Twitter account. BH Media has never requested, nor has it ever received, any information about the accounts which the Account itself follows, including about the interests or general trends among the accounts which the Account follows.

15

27.     Following Tucker's grant of ownership in the Account to Bitter, Bitter has never granted any other party an ownership interest in the Account.  Bitter has never agreed to relinquish any ownership interest in the Account to any party.  Bitter has never granted BH Media any ownership interest or control over the Account in any way.

28.     In June 2018, The Athletic contacted Bitter about joining its publication as a staff writer covering Virginia Tech athletics.  The Athletic is a subscription-based sports website that provides local sports coverage in markets throughout the country.  Unlike newspapers, The Athletic does not have print deadlines which often force sportswriters to write articles about games while they are still being played.  Largely because of this freedom, Bitter decided to resign from BH Media to join the staff of The Athletic, where he has more freedom to write about topics of interest to himself and his readers.  On June 22, 2018, Bitter gave BH Media notice that he would be resigning effective July 6, 2018.

29.     On Bitter's duly noticed last day, July 6, 2018, Bitter met with BH Media management including Lawrence McConnell, the Executive Editor of the Roanoke Times.  In this meeting, McConnell told Bitter that BH Media would need to take control of his Twitter account. McConnell specifically requested that Bitter give possession of the Account to BH Media.  This was the first time that any representative of BH Media ever asked Bitter to turn over access to the Account.

30.     Bitter told McConnell that he would not give the Account to BH Media.  Bitter explained to McConnell that the Account was Bitter's own property, and had been given to Bitter directly by Tucker, who had created the Account himself.  Bitter explained that the Account had never been the property of BH Media.

31.     Bitter was surprised when BH Media asked for the Account.  Numerous other reporters and sportswriters have left jobs at BH Media and have continued to maintain the same Twitter accounts they used while employed by BH Media at their new employers.

32.     Upon information and belief, BH Media has never asked any other employee of the Roanoke Times to relinquish their Twitter account when separating from employment.

33.     Following his separation from employment with BH Media, Bitter has maintained sole ownership and control over the Account.  Bitter has continued to protect the password of the Account, and remains the only person able to access the Account.

34.     Bitter began writing for The Athletic on July 16, 2018.  Bitter continues to use the Account, which he alone has maintained for the last seven years, to communicate with his follower base that he grew through his own efforts.  Bitter continues to provide personal insights, opinions, and comments about Virginia Tech athletics and college football, as well as about completely unrelated matters.  Bitter also links to content he writes for The Athletic, much as he chose to do while he worked for the Pilot and BH Media.

35.     Since Bitter joined The Athletic, BH Media has engaged in a campaign to injure Bitter in his personal reputation by publishing information about Bitter with reckless disregard for its falsity.

36.     Following the July 6, 2018 meeting, BH Media knew that Bitter was given possession of the Account directly from Tucker.  BH Media also knew that Bitter had never licensed, sold, or assigned the Account to it.

37.     Recognizing that this unmistakable grant of ownership from Tucker to Bitter could be fatal to its claims in the present litigation, McConnell contacted Tucker directly during a phone call on or about August 5, 2018.  Instead of asking Tucker about his memory of this event in a

17

good faith attempt to investigate a key fact for the claims at issue, McConnell asked Tucker to sign a sworn statement with BH Media's desired testimony regarding the establishment and ownership of the Account.

38.     Tucker told McConnell that if he were to sign such a statement, it would be a lie.

39.     Tucker went on to explain to McConnell that he had given the Account directly to Bitter outside of his employment with the Pilot or any other entity, and that the Account had never been the property of the Pilot or any other entity.

40.     Through this phone call, BH Media was not attempting to influence Tucker's testimony about just any issue.  All of BH Media's claims in the present action depend on its purported ownership of the Account.  Tucker, the creator of the Account, told BH Media that he gave the Account directly to Bitter, and the Account was never the Property of the Pilot or any other entity.

41.     Notwithstanding the call to Tucker, BH Media filed the Complaint in this action on August 6, 2018, the very next day.  In Paragraph 12 of the Complaint, BH Media alleges that following the end of his employment with the Pilot, Tucker "relinquished the Account to the Pilot." This assertion, of course, was directly contradicted by Tucker's statements.

42.     BH Media was more careful with its allegations in Paragraph 14 of the Complaint. There, BH Media alleges:

> In addition to taking over Tucker's reporting obligations, Defendant was provided access to and the login information for the Account in October of 2011, and from that date to present, Defendant has retained sole access to the Account.

Notably, BH Media did not specifically allege that the Pilot or the Roanoke Times provided the Account to Bitter, because following McConnell's conversations with Bitter and Tucker, BH Media knew such an allegation was false.

43.     On August 7, 2018, BH Media filed a motion for a Temporary Restraining Order ("TRO motion") seeking to have this Court prevent Bitter from using the Account and require him to give the Account to BH Media.  Later that day, instead of letting its legal filings (which, despite their frivolous and false nature, remain immune from a defamation claim) do the talking, BH Media abused its position as a media organization to publish false statements about Bitter.

44.     Through the Roanoke Times, BH Media published an article titled "Roanoke Times sues former sportswriter over continued use of Twitter account" (the "Article").  BH Media published statements in the Article without regard of their falsity, for the purpose of injuring Bitter in his trade or profession.

45.     First and foremost, the Article contains material falsehoods that go beyond the scope of the Complaint.  Referring to either the Pilot or the Roanoke Times, the Article affirmatively states that "[t]he **company** gave Bitter the login for the Twitter account." (emphasis added).  This statement is not only outside of the contents of the Complaint, it is a false statement about an issue of critical importance to the present case, and which was designed to harm Bitter in his trade or profession.

46.     Neither the Complaint nor McConnell's sworn statement in support of the TRO motion state that any specific entity provided the Account login to Bitter.  McConnell's call to Tucker shows that BH Media fully understood the critical importance of this issue to its claims in the present case.  BH Media also understood that Tucker provided the Account to Bitter some two months *after* he ended his employment with the Pilot.  Because it knew that neither the Roanoke Times nor the Pilot had provided the Account to Bitter, BH Media knew that it could not allege otherwise in its Complaint or else it could be subject to legal sanctions.  Yet BH Media, through

McConnell and others, chose to let the Article go to print with the false statement that the Pilot or Roanoke Times had provided the Account to Bitter.

47.    By falsely stating that "the company" provided Bitter with the login for the Account in the Article, an allegation that does not appear in the Complaint or TRO motion, the Article was not a fair report of their contents.

48.    Whether Bitter received the Account directly from the Pilot or the Roanoke Times instead of from Tucker individually is important to Bitter's reputation.  If an employee is given something directly by their employer but then refuses to return it, an observer may reasonably infer that the employee is dishonest, disloyal, and lacks integrity.  This is particularly damaging to a reporter, whose stock in trade is often credibility, discretion, and the ability to report things accurately.

49.    As a media conglomerate that fully understood this important distinction, BH Media published the false statement that Bitter was given the Account by the Pilot or Roanoke Times for the purposes of injuring Bitter in his profession.  This false statement creates the implication that Bitter is a dishonest employee who has taken property from his employer.

50.    The Article contained other false statements about Bitter outside of both the Complaint and TRO motion on which the Article purported to report.  For instance, the Article states that "[o]n June 22, when Bitter notified his supervisor that he was leaving the paper, management asked him to relinquish the Twitter account and password so that it could be provided to his replacement."  This statement of alleged fact is not contained in either the Complaint or TRO motion.  It is also false, as the first time any representative of BH Media asked Bitter to relinquish the Account was on July 6, 2018, his duly noticed last day at the Paper.  Prior to that date, Bitter had discussed with BH Media employees that he owned the Account, and while he was told that

McConnell may try to get it from him, no one at BH Media asked Bitter to relinquish the Account or discussed it in any detail with him until McConnell demanded it on July 6. Thus, the Article's statement that BH Media sought the return of the Account from the day that Bitter announced his departure (which McConnell, again, knew was false) was published with reckless disregard of its falsity.

51. This false statement was designed to injure Bitter in his trade or profession and cast him as an individual who lacks integrity. It implies that the decision by BH Media to seek the return of the Account was made immediately, with diligence, and with repeated notice to Bitter, and furthers BH Media's untrue implication that Bitter is a dishonest employee.

52. Moreover, even if the Article fairly and accurately summarized the Complaint and TRO motion (which it does not), BH Media would still face liability for defamation because BH Media published the Article about its own baseless and false legal filings not as a media organization issuing a fair report of their contents, but as a vindictive former employer acting with malice toward its former reporter. BH Media created the news story in the Article by filing the Complaint and TRO motion about which the Article reports, despite ample evidence that its claim was baseless and in a transparent attempt to injure Bitter. BH Media is not entitled to any privilege based on the Article's relationship to the present litigation.

53. BH Media created the controversy at issue when it filed the present action, then improperly fueled it by publishing falsehoods about Bitter in the Article that its Executive Editor knew were untrue. In contrast to BH Media's abuse of its position as a media organization, Bitter has not availed himself of any public avenues to comment on the present action or to refute BH Media's deliberate falsehoods about him. Bitter has not voluntarily inserted himself into the coverage of this controversy in any way.

## COUNT I – DEFAMATION

54.     Bitter incorporates and re-alleges each of the foregoing Paragraphs as if set forth fully herein.

55.     On or about August 7, 2018, BH Media published the Article on the Roanoke Times website where it could be read by any person with an internet connection.

56.     The Article, a true and accurate depiction of which is attached as **Exhibit A** and incorporated herein, contained false and defamatory statements of and concerning Bitter.

57.     Defendant's Article falsely states that Bitter was given the login information to the Account by the Pilot or the Roanoke Times, and that he was on notice for weeks leading up to his departure that BH Media had demanded that he relinquish the Account. Both of these statements give rise to the inference that Bitter is a dishonest employee who took property from his employer. They are expressly false, and the Article as a whole creates false implications and insinuations that would naturally and presumably be understood by those hearing or reading them as harming Bitter in his profession or trade by casting him as an untrustworthy former employee.

58.     By attempting to injure Bitter in his trade or profession and imputing to Bitter a lack of integrity, BH Media has committed defamation *per se*. Accordingly, Bitter is entitled to presumed damages.

59.     BH Media's publication of the Article was malicious, willful, and motivated by ill will and spite, or a desire to harm Bitter as a former employee who left BH Media to work for a competitor. Alternatively, BH Media's publication of the Article was, at a minimum, negligent.

60.     BH Media made the false and defamatory statements with knowledge of their falsity and/or reckless disregard as to the truth of the statements. BH Media, through McConnell, learned from Tucker that he had given the Account to Bitter directly. BH Media also knew that it

had not requested the Account from Bitter on June 22, 2018. Accordingly, BH Media published the Article containing these false statements with actual malice. BH Media, facing the loss of one of its most widely-read and well-regarded sports reporters, and fearing that The Athletic posed a competitive threat, initiated a smear campaign to paint Bitter as dishonest in the hopes of harming his reputation. It is difficult to imagine a more vindictive or malicious act a media outlet could take against a former employee with a stellar reputation like Bitter.

61. In addition, and in light of the malice with which BH Media acted toward Bitter, BH Media's self-serving decision to broadcast the baseless lawsuit through the Article, outside the judicial process, is an independent defamatory act that subjects BH Media to liability.

62. As a direct and proximate cause of BH Media's false and defamatory statements, Bitter has suffered damages, including but not limited to injury to his reputation.

## PRAYER FOR RELIEF

Based on the foregoing, Counterclaim Plaintiff Andy Bitter requests judgment against Counterclaim Defendant BH Media, Inc. as follows:

A. For an award of compensatory damages over $75,000 and in an amount to be determined at trial;

B. For an award of punitive damages over $75,000 and in an amount to be determined at trial;

C. For an award of his costs expended in this action;

D. For an injunction ordering BH Media to correct the Article; and

E. For such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Bitter hereby demands a trial by jury for all issues triable to a jury.

Dated: August 30, 2018

Respectfully submitted,

/s/ J. Benjamin Rottenborn
J. Benjamin Rottenborn (VSB # 84796)
Brooks A. Duncan (VSB # 87476)
WOODS ROGERS PLC
10 S. Jefferson St., Suite 1400
Roanoke, VA 24011
Telephone: (540) 983-7540
Fax: (540) 983-7711
brottenborn@woodsrogers.com
bduncan@woodsrogers.com

*Counsel for Defendant/Counterclaim-Plaintiff Andy Bitter*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 30th day of August 2018, the foregoing Notice of

Appearance was filed electronically with the Clerk of Court using the CM/ECF system, which

will send a Notice of Electronic Filing to counsel of record in this matter.


/s J. Benjamin Rottenborn
J. Benjamin Rottenborn