# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **BH MEDIA GROUP, INC.,** | ) | |
| | ) | |
| *Plaintiff and Counter-Defendant,* | ) | |
| | ) | |
| **v.** | ) | **Case No.: 7:18cv388** |
| | ) | |
| **ANDY BITTER,** | ) | |
| | ) | |
| *Defendant and Counter-Plaintiff.* | ) | |

## DEFENDANT AND COUNTER-PLAINTIFF ANDY BITTER'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff BH Media is not entitled to preliminary, mandatory relief in its effort to commandeer Andy Bitter's personal Twitter account @AndyBitterVT (the "Account"). Bitter is the sole and exclusive owner of his Account. BH Media has never owned or controlled his Account. Although there are myriad reasons why the Court may reject BH Media's extraordinary request, BH Media's lack of ownership is dispositive of every claim in this case.

BH Media's Complaint and request for injunctive relief are founded on provably false assertions regarding who created and owned the Account, and they ignore the stated policy of the Roanoke Times (the "Times") that reporters are "strongly encouraged to push original reporting through their *personal social media accounts*." Its argument is also contrary to established trade secret law and the customs and practices of the Times and the journalism industry as a whole. For these and other reasons below, the Court should reject BH Media's meritless attempt at corporate piracy.

## FACTUAL BACKGROUND

**I.     Kyle Tucker created the Account and gave it to Andy Bitter in an unbroken chain of ownership that does not include BH Media.**

The central issue in this case is ownership of the Account. The evidence unequivocally demonstrates Bitter owns the Account, and Bitter's ownership is dispositive of all BH Media's claims.

1

The Account was created in 2010 by Bitter's predecessor at the Virginian-Pilot (the "Pilot"), Kyle Tucker ("Tucker"). Tucker Decl., **Exhibit 1** ¶ 3. At the time, few people used Twitter, and Tucker viewed it as a new and interesting way to connect with people. *Id.* ¶ 5. The Pilot did not ask Tucker to set up his Account, which he did using his personal email address. *Id.* ¶¶ 3, 5. Throughout the time he owned the Account, Tucker had exclusive control over the Account and its content. *Id.* ¶ 6.

In August 2011, Tucker left the Pilot to take a job covering Kentucky basketball in Louisville. *Id.* ¶ 8. During his employment, no one at the Pilot ever asked Tucker for his Account or its login information or expressed the view that the Pilot owned or was entitled to his Account. *Id.* It wasn't until October 4, 2011, after Bitter was hired to replace Tucker at the Pilot, that Tucker unilaterally decided to offer his Account to Bitter. *Id.* ¶¶ 8-9. Tucker believed his approximately 4,000 Twitter followers would appreciate the continuing coverage of Virginia Tech football that Bitter could provide, rather than Tucker's new coverage of Kentucky basketball. *Id.* ¶ 9. So on October 4, 2011, Tucker sent an email from his personal Gmail account to Bitter's personal Gmail account offering to give Bitter his Account. *Id.* Bitter accepted the offer, assuming ownership of the Account.

Bitter then began using the Account as his own personal account. When he accepted ownership and control of the Account from Tucker, Bitter changed the login information and the handle to @AndyBitterVT and identified himself as the owner and originator of all communications on his Account. Bitter Decl., **Exhibit 2** ¶ 7. Through his own efforts over the past 7 years, Bitter now has nearly 28,000 followers. *Id.* ¶ 8.

Since Tucker gave him the Account, Bitter alone has (1) maintained ownership and control of his Account; (2) accessed and posted to his Account; (3) possessed login information for his Account; and (4) created all the content on his Account, including content relating to Virginia Tech football and personal insights and opinions about unrelated matters, all subject to his sole and absolute discretion. *Id.* ¶¶ 9-11. Bitter has never signed or been asked to sign any document transferring ownership of his

Account or giving BH Media any information about his Account. *Id.* ¶ 11. On occasion, Bitter permitted the Times to use tweets from his Account on the Times' website, without conveying any ownership therein.[1] *Id.* ¶ 12.

In short, the Account was Bitter's personal Twitter account the day he took it over from Tucker, and it remained his throughout his tenure at the Pilot and the Times. Neither his employment offer letter from the Pilot, nor any subsequent agreement with any entity, assigned ownership of his Account to the Pilot or granted the Pilot, or any other entity, any rights whatsoever in his Account. *Id.* ¶ 17.[2] When BH Media bought the Times in May 2013, Bitter never assigned or sold his Account to BH Media in the transaction, and he did not even become an employee of BH Media until January 1, 2014. *Id.* ¶ 19. It wasn't until July 6, 2018, his last day at the Times, that BH Media asked him to turn over his Account to the company. *Id.* ¶ 22.

## II.     BH Media never acquired the Account when it bought the Times.

In its Complaint, BH Media alleged, without any supporting documentation, that

> The Times licensed the Account and its content from the Pilot (the Pilot and Times were jointly owned by Landmark Media Enterprises, LLC ("Landmark")) until BH Media purchased the Times and the Account from Landmark in 2013, at which point BH Media became, and remains, the sole and exclusive owner of the content and the Account.

Compl. ¶ 11. BH Media has now produced the documents, but they do not, in any way, support its bald allegations of ownership.

BH Media produced a Membership Interest Purchase Agreement through which Landmark sold the Times, but *not* the Pilot, to World Media Enterprises, Inc., presumably an affiliate of BH

---

[1] Bitter has also maintained a personal Facebook page on which he posts content about Virginia Tech football. BH Media is not seeking to misappropriate Bitter's Facebook account. Ex. 2 ¶ 13.

[2] While the posting for Bitter's job generally sought a reporter with social media experience (*id.* ¶ 5), that has no bearing on Bitter's ownership of his personal media accounts. Indeed, the posting also sought a reporter willing to travel to cover games, but BH Media cannot claim ownership of Bitter's car.

3

Media, on May 31, 2013. Unsurprisingly, the document says absolutely nothing about Bitter's Account. It is not listed in any schedule of assets, including the extensive schedule of Intellectual Property conveyed in the transaction, *see, e.g.*, **Exhibit 3**, Excerpts of Membership Interest Purchase Agreement, BHMEDIA 15-17, 137-139, nor is it listed in the schedule of "Licensed-In IP" that the Times used pursuant to a license from another person or entity. *See id.* BHMEDIA 49, 140-143.

The only reference to Bitter in the transaction documents is in the schedule of intercompany transactions, which states that the Times and Pilot "have an oral agreement pursuant to which they share a sports reporter to cover Virginia Tech football year-round. The current reporter is Andy Bitter. Each of the [Times and Pilot] pay for half of all payroll and travel related costs and the Company provides the reporter with office space when needed in Roanoke." *See id.* BHMEDIA 265. This reference is unhelpful to BH Media, and indeed contradicts any claim of ownership by BH Media. First, it says nothing about ownership of Bitter's Account. Next, despite the fact that the Times paid for half of Bitter's salary, he was not considered a Times employee. Indeed, while the transaction documents list all the Times employees, Bitter is not among them. *See id.*, BHMEDIA 213-218. This makes sense, because he did not become a BH Media employee until on or about January 1, 2014, well after the sale. Ex. 2 ¶ 19.

The deal documents even contradict BH Media's own misguided theory that is founded on the false premise that the Pilot owned the Account prior to May 31, 2013. *See* Compl. at ¶ 11. Even if the Pilot could have owned the Account (and it did not), BH Media alleges the Times was a mere licensee until BH Media purchased the Times on May 31, 2013. *Id.* BH Media, however, did not acquire the Pilot or its assets on May 31, 2013. *See generally*, Ex. 3, BHMEDIA 1. Further, there is no evidence the Pilot ever acquired ownership of the Account or granted ownership of the Account to the Times

4

or BH Media, at any point.[3]

## III.    Industry standards, customs and practice support Bitter's ownership.

Without any document to support a transfer of ownership of the Account or any supporting chain of title therein, BH Media nevertheless asks the Court to take the unprecedented step (at either a preliminary or final stage) of ordering a reporter to relinquish ownership and control of his personal social media account based on nothing more than BH Media's unfounded belief that it should own his Account. This flies in the face of industry standards and customs and BH Media's own practices.

Bitter has retained J.A. Adande, one of the most distinguished and qualified sports journalists in the nation, to testify regarding industry customs and practices regarding ownership of personal social media accounts reporters use in connection with their jobs. Adande is currently the Director of Sports Journalism and Associate Professor at Medill School of Journalism at Northwestern University. **Exhibit 5**, Adande Dec. ¶ 1. Prior to taking that job in 2016, Adande was a sports columnist at the Chicago Sun-Times, Washington Post, Los Angeles Times and, more recently, ESPN. *Id.* ¶ 3. At ESPN, Adande was a sports columnist and NBA sideline reporter, as well as a panelist on ESPN's television program "Around the Horn." *Id.* ¶ 3.

Adande has extensive knowledge and experience with the customs and practices in the industry relating to use and ownership of sports journalists' social media accounts. His opinion is that unless a sports journalist has a written contract with his or her employer that states that the employer owns the social media account used by the journalist or the account is one created and controlled by the employer (e.g., @espn or @NYTSports), then the sports journalist personally owns his or her

---

[3] The only documents BH Media produced that even reference the Account are two syndication agreements dated December 2013 and 2014 (*after* BH Media's purchase of the Times) through which the Times permitted the Pilot to use Bitter's Virginia Tech football content for a syndication fee. **Exhibit 4**, "Syndication Agreements", BHMEDIA 275-277. Although the Times baldly states the Account is owned by the Times, the syndication agreements are nothing more than free-standing and self-serving statements of ownership to a third party that do not *grant* any ownership rights in the Account to the Times. Its December 2013 assertion of ownership is particularly illogical given that Bitter was not a BH Media employee at that point.

social media accounts and is free to continue to use those accounts even as he or she moves to different jobs. *Id.* ¶ 11. Tucker and Bitter also share this opinion, based on their own experience and knowledge of industry customs and practices. *Id.* ¶¶ 13, 26; Ex. 2 ¶ 18.

This opinion is informed by numerous sources, including Adande's personal experience. He is an active Twitter user whose account has the handle @jadande. Adande created his account in March 2009 while working for ESPN. Ex. 5 ¶ 13. He used his account to report sports news, and there were times when his Twitter feed was automatically incorporated into the ESPN.com NBA section. *Id.* Yet when he left ESPN in 2016, he retained his Twitter account and his 600,000 followers. *Id.* ¶ 15. ESPN never suggested in any manner that it owned Adande's account. *Id.*

Numerous other examples abound of journalists who used personal Twitter accounts to report news, yet kept their accounts when they moved to a different organization. One prominent example is former ESPN writer Bill Simmons, whose Twitter account has millions of followers. *Id.* ¶ 17. When Simmons left ESPN to join HBO and created a new website called The Ringer, he was able to use his existing Twitter account (albeit under a new handle) to promote his new ventures. *Id.*

Even when a media organization creates a personal social media account for a journalist, it is customary for that journalist to retain ownership of the account. Take, for example, ESPN's Michelle Beadle, whose Twitter account was created by ESPN employees who, for a short time, posted under her name before she decided to control the posts herself. *Id.* ¶ 18. Despite the fact that ESPN created her account and, at least initially, made posts under her name, Beadle maintained possession of her account when she left ESPN to join NBC in May of 2012 and then when she returned to ESPN in 2014. *Id.*

Adande will testify about numerous other prominent sports journalists who retained their personal Twitter accounts after changing jobs, including Tony Reali (the host of ESPN's "Around the Horn" program whose Twitter handle was the show's name but who retained his account under a

different name when he left for Good Morning America in 2014); Adrian Wojnarowski (a current ESPN sports columnist who previously worked at Yahoo! Sports and whose personal Twitter handle, now @wojespn, has included references to his employers); Shams Charania (a former NBA writer for Yahoo! Sports who recently moved to The Athletic); Marc Stein (a former NBA writer for ESPN who is now the national NBA writer for the New York Times); and Jemele Hill (a former SportsCenter anchor who just left ESPN and retained her Twitter account). *See id.* ¶¶ 19-22.

The above examples are just some instances of well-known sports journalists who have changed jobs and retained their personal Twitter accounts. These examples comport with the uniform industry standard that, absent a written contract to the contrary, the writer's account follows the writer. *Id.* ¶ 11. Based on his review of Bitter's Twitter account, Adande will testify that Bitter used his Twitter account in the customary manner that journalists use their personal accounts, and that he should retain ownership of that account in the same customary manner. *Id.*

BH Media's own practices with respect to departing employees align with this industry practice. Carole Tarrant, the Editor of the Times from May 2007 to June 2013—and during the acquisition by BH Media—frequently posted Tweets promoting the Times and its reporting on her Twitter account, @caroletarrant, but retained her account when she joined Virginia Western Community College. **Exhibit 6**, Tarrant Dec. ¶¶ 10-11. Tarrant personally set the policy at the Times encouraging and authorizing reporters like Bitter to use their own personal social media accounts in connection with their reporting. *Id.* ¶¶ 6-7. She did so because it was her professional opinion, as the Editor, that readers prefer to follow individuals, not companies, on social media. *Id.* ¶ 6. In her experience at the Times, personal social media accounts were always viewed and treated as personal accounts of the reporters, and at no point during her tenure did anyone express to her a view to the contrary. *Id.* ¶ 8. In fact, at no point during her tenure with the Times did anyone express to her the view that either The Virginian-Pilot, the Times, or BH Media owned the Account, or any of Bitter's

7

other personal social media accounts. *Id.* ¶ 9. Former Times education reporter Sara Gregory, who now works for the Pilot, maintained her personal Twitter account after leaving, despite the fact that she used this account to report on education in the Roanoke Valley. Ex. 2, ¶ 23. Similarly, former Charlottesville Daily Progress football reporter Jerry Ratcliffe retained his personal Twitter account after he left to start his own, competing website. *Id.*

## IV. BH Media's Policies encourage use of personal social media accounts.

BH Media has produced copies of a 2017 BH Media Employee Handbook[4] (the "Handbook") and 2015 "Professional Standards and Content Policies" (the "Policies"). The Handbook and Policies show that BH Media "strongly encouraged" reporters to use their *personal* social media accounts in conjunction with their work at BH Media. The Handbook and Policies are devoid of any language or disclaimer telling employees that following its Policies with *personal* accounts would result in forfeiture of those *personal* social media accounts and a later claim of ownership by BH Media. To the contrary, BH Media explicitly embraced and endorsed the use of *personal* Twitter accounts to promote reporters' work and the Times, all with the expectation that employees would retain ownership:

> **Breaking News and Live Events**
>
> News staffers are strongly encouraged to push original reporting through their personal social media accounts, especially when covering breaking news or live events.
>
> In a breaking news situation, use caution when posting or passing along information that has not been independently confirmed. Try to bring your followers to the scene of the news, focusing on what you can see and hear from your position.

*See* **Exhibit 7**, Excerpts of "Roanoke Times' Professional Standards and Content Policies," BHMEDIA 379, BHMEDIA 395 (emphasis added).

The Policies confirm BH Media's expectation that reporters will and should use their personal Twitter accounts in conjunction with their reporting but do nothing to render such accounts the

---

[4] Defendant's Complaint references and relies upon an employee handbook signed by Bitter in 2015. See Compl. at ¶ 23. No handbook from 2015 has been produced. The Handbook produced by Plaintiff is dated 2017 and there is no signed acknowledgment of receipt by Bitter.

property of BH Media. *See id.* To the extent BH Media now contends otherwise, its Policies were nothing more than surreptitious attempts to induce reporters to unwittingly forfeit ownership of personal accounts—and would give rise to fraudulent inducement claims. That position, however, is at odds with the plain meaning of the Policies, the realities of modern reporting, any sense of fairness, and the law of fraudulent inducement.

BH Media recognizes it cannot actually control personal Twitter accounts, stating that "[s]taffers have no obligation to use their personal social media account(s) to promote their own work with the Roanoke Times." *Id.*, BHMEDIA 395-396. BH Media, however, plainly encourages and induces reporters to use personal social media accounts to promote and connect to the Times' online material. For example, the Policies suggest that "whenever possible, include [in your personal account] a working link to the work you're promoting." *Id.*, BHMEDIA 396. This suggestion highlights BH Media's recognition that best practices for reporters are to promote their professional work through their personal social media accounts, but that such promotion does not render the personal social media account the property of BH Media.

Further supporting Bitter's position is the clear distinction the Policies draw between personal accounts and "branded accounts," over which BH Media exercises direct control. *See* Ex. 7, BHMEDIA 394-95. Branded accounts are social media accounts controlled by the Times editors which are "branded" to the Times. The Times operates many of these Branded Accounts, some of which are displayed in **Exhibit 8**. These include @roanoketimes; @sportsTRT; @RkeTimesLIVE; @RoanokeTimesBiz; @Timesland (a high school sports account to which Bitter and several of his colleagues often posted).[5]

---

[5] Bitter acknowledges that during part of his ownership of the Account, he associated his work email address with the Account. That fact alone, however, obviously does not amount to a transfer of ownership of the personal Account to BH Media, particularly in light of BH Media's inducement to associate the account with work.

The Policies confirm the customs and practices in the reporting industry held true at the Times—reporters are explicitly permitted and encouraged to leverage their personal social media account for professional pursuits and to highlight work for publications. Naturally, the Times benefitted from this marketing, but this does not amount to a transfer of ownership of personal accounts to BH Media.

The Handbook, which BH Media cites extensively in its Complaint, contains nothing that suggests the Times owns the Account. At the outset, by its own terms, the Handbook imposes no contractual obligations on Bitter. *See* **Exhibit 9**, Excerpts of the BH Media Employee Handbook, BHMEDIA 283. Thus, it cannot provide a mechanism through which the Times took possession of the Twitter Account. Further, the Handbook, when referencing "Social Networks" states: "Communication accounts provided by the Company to employees are for the conduct of work-related business..." *Id.*, BHMEDIA 327-328. It, therefore, clearly distinguishes between "[social media] accounts provided by the Company" and Bitter's Account, which was provided by Tucker, not "the Company."[6] Otherwise, the Handbook is wholly unremarkable, confirming among other things, that upon terminating employment, employees must return Company property, *id.*, BHMEDIA 295, limiting access to the Times' owned computers and software, *id.*, BHMEDIA 325-327, and limiting company access and use to "Communication Accounts *provided by the Company*," *id.*, BHMEDIA 327, (emphasis added).

---

[6] "Company" refers to BH Media Group. Further, the Handbook contains a Social Media Policy that primarily encourages employees to use good judgment and act respectfully when posting on social media. But it contains nothing that transfers ownership of any social media account to BH Media.

## ARGUMENTS AND AUTHORITIES

### I. Standard of Review.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). It is a remedy that is "granted only sparingly and in limited circumstances." *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal citation and quotation marks omitted). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Therefore, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter,* 555 U.S. at 20. Under the standard analysis, Plaintiff must make a "clear showing" that he is likely to succeed on the merits and is likely to be irreparably harmed absent preliminary relief. *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013).

The *Winter* elements, however, "face a heightened injunctive standard for mandatory, rather than prohibitory, preliminary injunctions." *Pro-Concepts, LLC v. Resh*, 2013 WL 5741542, at *4 (E.D. Va. 2013) ("The demanding standard [for preliminary injunctions] becomes even more exacting when a plaintiff seeks a preliminary injunction *that mandates action*…[rather than] merely preserv[ing] the status quo pending trial.") (emphasis in original); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980). Thus, "[t]o justify a mandatory injunction…the movant must [go beyond the clear showing standard and] demonstrate a *clear and convincing* probability of success." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 566 (E.D. Va. 2016) (emphasis added).

11

## II. BH Media cannot establish a clear & convincing likelihood of success on the merits.

### A. Bitter's ownership of the Account is dispositive of all claims.

In order to prevail on its Motion for mandatory relief, BH Media must first prove a clear and convincing probability of success on the merits. *See id.* Because its claims hinge on ownership of the Account, Compl. ¶¶ 14-31, BH Media must meet the clear and convincing probability standard with proof it is the rightful owner of Bitter's Account. It cannot do so. As the facts set forth above show, Bitter alone owns the Account. There is not a shred of evidence or chain of title vesting ownership in BH Media. Indeed, ownership by BH Media would be contrary to its own Policies and practices and contrary to industry customs and practices.

Even if ownership of Bitter's Account could be credibly disputed (and it cannot), if there are unresolved disputes of material facts regarding ownership, BH Media cannot meet its clear and convincing standard. *See, e.g., W. Indus.-North, LLC v. Lessard*, 2012 U.S. Dist. LEXIS 38697 at *8 (E.D. Va. 2012) ("[E]vidence presented by [d]efendants in their opposition and at the preliminary injunction hearing raises a sufficient question as to [plaintiff's] ownership to warrant denial of the mandatory injunctive relief sought."); *cf. Brown v. Bimbo Foods Bakeries Distribution*, 2016 U.S. Dist. LEXIS 154457 at *5 (E.D. Va. 2016) (recognizing unresolved disputes of material fact preclude a finding of a likelihood of success under the lower standard for prohibitory injunctions); *W.A.K. ex rel. Karo v. Wachovia Bank, N.A.*, 2009 WL 3669721 at *5 (E.D. Va. 2009) (same); *Dynamic Aviation Grp., Inc. v. Dynamic Int'l Airways*, 2016 U.S. Dist. LEXIS 39248 at *45 (W.D. Va. 2016) (same).[7]

### B. BH Media's Trade Secret claims fail.

BH Media fundamentally misapprehends and misapplies trade secret law to the Account. As

---

[7] In the only case known to Bitter in which a court issued a preliminary injunction requiring a defendant to relinquish a social media account, it was "uncontested" that the plaintiffs owned all social media account access information and login credentials pursuant to a written contract. *Ardis Health, LLC v. Nankivell*, 2011 U.S. Dist. LEXIS 120738 at **2-3, 8 (S.D.N.Y. 2011). In the face of Bitter's evidence of ownership of the Account, BH Media cannot come close to showing a clear and convincing probability of success.

a matter of law, the Account is not a trade secret and does not contain any trade secret arguably owned by BH Media.

BH Media does not identify any purportedly secret "*information*" it contends is a trade secret. Instead, the thrust of BH Media's trade secret claims is that BH Media is deprived of the ability to use certain Twitter *tools* available to account holders to view publicly available information. Compl. ¶ 16 (alleging account holders are able to view publicly available information through a "unique Twitter Feed visible only to those with [the Account's] access rights."). BH Media also contends that the account manager maintains the "*exclusive right* to direct message or 'DM' Twitter followers, which creates *the opportunity* to share private messages." Compl. ¶ 16 (emphasis added). Although this allegation is demonstrably false because others can send and receive direct messages,[8] BH Media clarifies in its brief that it is merely deprived of a Twitter *tool* that enables account holders to "directly communicat[e] with a curated list of followers *en masse*." ECF No. 6, at 9. Again, BH Media fails to identify the content of any Direct Message it contends is a trade secret. Regardless, as set forth in the Twitter User Agreement, **Exhibit 10**, *all information* sent to or through Twitter, including via Direct Messages, is either public or subject to public disclosure and cannot, as a matter of law, qualify as a trade secret.[9] Moreover, Twitter's tools are not trade secrets that could arguably be owned by BH Media.

---

[8] *See, e.g., https://help.twitter.com/en/using-twitter/direct-messages* (stating: "Anyone you do not follow can send you a Direct Message if: You have opted in to receive Direct Messages from anyone or; You have previously sent that person a Direct Message." "Anyone in a conversation can send Direct Messages to the group." "You can start a private conversation or create a group conversation with anyone who follows you.").

[9] Ex. 10, 4-5. ("Your Rights and Grant of Rights in the Content") (granting Twitter the absolute and unfettered right to "make [all] Content *available to the rest of the world and to let others do the same*" and "make Content *submitted to or through the Service* available to other companies, organizations or individuals for the syndication, broadcast, distribution, promotion or publication of such Content on other media and services…*with no compensation paid to you* with respect to the Content that you submit, post, transmit or otherwise make available through the Services."). "Content" is defined as "any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services." Ex. 10, 3. Twitter further recognizes that "[t]hese rules exist to enable an open ecosystem." *Id.*

To prove misappropriation of a trade secret, a plaintiff must establish "(1) the existence of a trade secret and (2) its misappropriation by the defendant." *See Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 405 (2012). Virginia's Uniform Trade Secrets Act, Va. Code § 59.1-336, *et seq.*, defines a "trade secret" as:

> *information*, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > 1. Derives independent economic value, actual or potential, *from not being generally known* to, and not being *readily ascertainable by proper means* by, other persons who can obtain economic value from its disclosure or use, and
> >
> > 2. Is the subject of *efforts that are reasonable* under the circumstances to *maintain its secrecy.*

Va. Code § 59.1-336 (emphasis added).[10]

Despite the fact that BH Media's trade secret claims are a misguided attempt to assert rights over Twitter's tools and not *information* available through the service, even if BH Media could reasonably identify some *information* it claims is a trade secret, any such claim would fail because: (1) all information provided to and through Twitter is not secret or subject to reasonable efforts to maintain secrecy; and (2) BH Media fails to reasonably identify any information that has independent economic value from not being generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

### 1. The manner of accessing information on Twitter is not a trade secret arguably owned by BH Media.

As an initial matter, a trade secret must be "information." Va. Code § 59.1-336; 18 U.S.C. § 1839(3). Publicly available tools used merely to access or convey information, however, are not themselves "information," and cannot qualify as a trade secret. *See, e.g.*, *CDM Media United States, Inc.*

---

[10] Like BH Media, Bitter agrees the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, ("DTSA") contains substantially similar elements and, for present purposes, need not be analyzed separately. *See* ECF No. 6 at 7, n.4.

*v. Simms*, 2015 U.S. Dist. LEXIS 37458 at *12-14 (N.D. Ill. 2015) ("While a private communication can contain a trade secret, it is not itself a trade secret. It is therefore insufficient for Plaintiff to allege that the LinkedIn group's private communications were trade secrets"); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 330 F. Supp. 2d 668, 678 (E.D. Va. 2004) ("A written document is not information, but rather a vehicle for expressing information, thus, a document itself cannot be a trade secret, although it may contain trade secrets."); *cf. MicroStrategy, Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 429 n.4 (E.D. Va. 2004) ("A trade secret is information and a CD Key, a series of random numbers, is not information. Instead, it is a lock - a barrier - to the access of information that might properly be considered a trade secret."); *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F. Supp. 2d 309, 321 (E.D. Va. 2009) (recognizing passwords are not "information" that qualify as trade secret, but merely tools to access information).

Without question, Twitter's access tools, such as Direct Messaging and "unique Twitter Feed" displays, are not "information"; they are mere vehicles to access information that are owned and provided by Twitter to all users and the public at large. *See id.* While Twitter may own trade secrets in the undisclosed information (such as source code) it developed to create the tools it makes available to the public, as far as users like BH Media and Bitter are concerned, they have no ownership right or interest in any "secret" aspect of Twitter's Direct Messaging or Twitter Feed displays.[11]

Because these tools are not "information," and BH Media does not identify any secret content on Twitter that it contends is a trade secret, BH Media cannot even establish the most basic element of a trade secret claim: proving that it has a right or interest in "information." *See, e.g.*, McConnell

---

[11] *See* Ex. 10 at 7 ("Your License to Use The Services") (stating: "All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain the exclusive property of Twitter and its licensors"). Twitter's "Services" include "various websites, SMS, APIs, email notifications, applications, buttons [including the Direct Message button], widgets, ads, commercial services and other covered services (https://support.twitter.com/articles/20172501)." Ex. 10 at 3.

Decl., ECF No. 6-1, at ¶¶ 16-20 (failing to plausibly identify any information and focusing, instead, on BH Media's inability to use certain Twitter access tools).

### 2. BH Media cannot establish secrecy or reasonable efforts to maintain secrecy.

Even if BH Media could reasonably identify "information" it contends is a trade secret, any trade secret claim must fail, as a matter of law, because BH Media cannot establish that such information is secret or that it took reasonable efforts to maintain information on Twitter as secret.

"The crucial characteristic of a trade secret is secrecy rather than novelty." *Dionne v. Southeast Foam Converting & Packaging, Inc.*, 240 Va. 297, 302 (1990). BH Media, however, has not identified any nonpublic, "secret" information on Twitter, as required to state a claim. *See, e.g.*, *CDM Media United States, Inc.*, 2015 U.S. Dist. LEXIS 37458 at *13-14.

BH Media, of course, cannot meet this burden because everything on Twitter is public or subject to public disclosure. *See, e.g.*, Ex. 10 at 17 ("Most activity on Twitter is public, including…your Tweets…The lists you create, people you follow and who follow you, and Tweets you Like or Retweet are also public.") (emphasis added); *see supra* n. 9; *cf. Cohen v. Trump*, 2016 U.S. Dist. LEXIS 69985 at *19-20 (S.D. Cal. 2016) ("To the extent that the disputed material's trade secret status rested on how it was compiled, the release of the entire compilation [on the internet] vitiates the argument that the compilation constituted a trade secret"); *Eagle v. Morgan*, 2011 U.S. Dist. LEXIS 147247 at *37 (E.D. Pa. 2011) ("[N]either the telephone number nor the LinkedIn account connections qualify as trade secrets, as both are either generally known in the wider business community or capable of being easily derived from public information."). Indeed, all Bitter's followers, all accounts he is following, all of his Tweets and Retweets and all of his Likes are publicly disclosed and available to anyone who accesses Twitter.[12]

---

[12] *See also* https://twitter.com/AndyBitterVT; https://twitter.com/AndyBitterVT/followers; https://twitter.com/AndyBitterVT/following; https://twitter.com/AndyBitterVT/likes.

In any event, "[s]ince secrecy is a requisite element of a trade secret, it follows that unprotected disclosure of the secret will terminate that element … [and] [t]he courts are uniform on this point." 1 Milgrim on Trade Secrets § 1.05 (2018). Accordingly, disclosure to persons or entities that are under no obligation to protect confidentiality eviscerates a trade secret. *See, e.g.*, *Young Design, Inc. v. Teletronics Int'l, Inc.*, 2001 U.S. Dist. LEXIS 21851 at *18-19 (E.D. Va. 2001) ("Whatever trade secrets rights might have existed at one time 'do not survive when otherwise protected information is disclosed to others, such as customers, or the general public, who are under no obligation to protect [their] confidentiality.'") (internal citations omitted); *Microstrategy Servs. Corp. v. OpenRisk, LLC*, 2015 U.S. Dist. LEXIS 32719 at *22 (E.D. Va. 2015) (dismissing trade secret claim because a consultant who received the information was under no "express or implied duty to keep the information confidential"); *Montgomery County Ass'n of Realtors v. Realty Photo Master Corp.*, 878 F. Supp. 804, 814 (D. Md. 1995), *aff'd*, 91 F.3d 132 (4th Cir. 1996) (computerized database distributed to members of an association and potential purchasers was not maintained in secrecy and thus could not be a trade secret).

Even if BH Media could reasonably identify some set of nonpublic information on Twitter, such as the content of Direct Messages, as a potential subject matter of an alleged trade secret (and it cannot), BH Media's trade secret claims nonetheless fail because it (and all other Twitter users) granted Twitter the absolute and unfettered right to "make [all] Content *available to the rest of the world and to let others do the same*" and "make Content *submitted to or through the Service* available to other companies, organizations or individuals for the syndication, broadcast, distribution, promotion or publication of such Content on other media and services…*with no compensation paid to you* with respect to the Content that you submit, post, transmit or otherwise make available through the Services." Ex. 10 at 4-5. This unprotected release of information, including Direct Messages, to Twitter and others, destroys any

17

claim that information on Twitter is subject to reasonable efforts to maintain secrecy.[13]

Accordingly, BH Media can never meet the secrecy element with respect to information provided to or through Twitter and can never state a plausible claim against Bitter for trade secret misappropriation—even if it arguably had some right in Bitter's Twitter Account (and it does not). Because BH Media cannot even state a trade secret claim, it cannot succeed on the merits.

### 3. BH Media fails to identify information that derives independent economic value from not being generally known or ascertainable.

BH Media also fails to identify any information on Twitter that allegedly derives economic value from not being generally known or readily ascertainable by proper means. Indeed, all information on Twitter is too generally known to have any value from secrecy. This is an independent ground for defeat of BH Media's trade secret claims.

"If a competitor [can] easily discover the information legitimately, the inference is that the information was either essentially 'public' or is of *de minimis* economic value." *MicroStrategy, Inc.*, 331 F. Supp. 2d at 416-17; *Cohen*, 2016 U.S. Dist. LEXIS 69985 at *13 ("Information which is too generally known to derive value from secrecy cannot obtain trade secret protection even without disclosure."); *cf. Cablecom Tax Servs. v. Shenandoah Telcoms. Co.*, 2013 U.S. Dist. LEXIS 76169 at *19 (W.D. Va. 2013) ("In order to be protected as a trade secret, the information in question…must not be of public knowledge or of a general knowledge in the trade or business."); *Art & Cook, Inc. v. Haber*, 2017 U.S. Dist. LEXIS 164366 at *7-8 (E.D.N.Y. 2017) ("a contact list contains little more than publicly available

---

[13] No court has found that information provided to or through Twitter is a trade secret. *Cf. PhoneDog v. Kravitz*, 2011 U.S. Dist. LEXIS 129229 at *15-20 (N.D. Cal. 2011) (failing to consider or address Twitter's public disclosure rights set forth in pages 4-5 of Ex. 10, Twitter's User Agreement, but denying a motion to dismiss a trade secrets claim related to Twitter because it "requires consideration of evidence beyond the scope of the pleading."). BH Media cites *CDM Media*, for the proposition that "a membership list on a LinkedIn page *may* constitute a trade secret." (ECF 6 at 8) (emphasis added). The "membership list" at issue, however, was not found to be a trade secret because "too little [was] known about the contents, configuration, and function of the LinkedIn group" at the motion to dismiss phase. *CDM Media*, 2015 U.S. Dist. LEXIS 37458 at *12. In any event, *CDM Media* is distinguishable because, unlike on Twitter, "names of [the LinkedIn Group] members were not generally available to the public at large." *Id.* at *4.

information, even if it takes considerable effort to compile, it is not accorded protection under the DTSA" or state law.); *Tryco, Inc. v. United States Med. Source*, 80 Va. Cir. 619, 626-27 (Cir. Ct. 2010) ("Where a contact list contains information that is entirely available in the public domain and ascertainable by proper means, the contact list is not a trade secret.").

BH Media fails to identify any aspect of the Account that is not "generally known" to the public and could (even theoretically) derive value *from secrecy*.[14] Instead, BH Media simply asserts that Bitter's Account provides a customized view of publicly disclosed followers that is impossible to replicate (because it is unlikely the same exact followers will follow another account), Compl. ¶ 43, and BH Media allegedly lost the value through its inability "to interact and associate with the Account's [publicly disclosed] [F]ollowers" *through Bitter's Account*, Compl. at ¶ 4. Although these allegations are vaguely but artfully framed to allege "value," that value is not tied, in any way, to secrecy. This too, is fatal to BH Media's trade secret claims. *See, e.g.*, *McKay Consulting, Inc.*, 665 F. Supp. 2d at 635 ("[I]t requires no great leap to conclude that because more than 25 million people could have accessed the newsgroup postings [on the Internet], these works would lose their status as secrets and were thus 'generally known'") (internal citation and quotations omitted); *Eagle*, 2011 U.S. Dist. LEXIS 147247 at *37 (finding LinkedIn account connections are "either generally known in the wider business community or capable of being easily derived from public information."); *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 970 (C.D. Cal. 2010) (finding vague assertion that a publicly available product

---

[14] Recognizing no court has determined the inherently open and public aspects of Twitter can establish a trade secret claim, BH Media makes the vague assertion that "ancillary information available through a social media follower list may constitute a trade secret," ECF No. 6, at 8-9 (citing *Regas Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1074-76 (D. Colo. 2012)). This case is unhelpful for BH Media because the employee's job responsibility was to build a friend list on MySpace to promote his employer's nightclub, and friend list included *nonpublic* information like email addresses making the friend list akin to a "database of contact information." *Id.* at 1076. Unlike the present case, BH Media has not identified any nonpublic *information* available to the holder of the Account, and Bitter was not similarly tasked with maintaining his Twitter followers as part of his job duties.

19

Case 7:18-cv-00388-MFU   Document 19   Filed 09/17/18   Page 19 of 27   Pageid#: 120

that allegedly "was customizable and customized" is insufficient to support a claim that it derives independent economic value from not being generally known).

### C.    BH Media's Computer Crimes claims fail.

All of BH Media's computer-related claims fail for one simple reason: BH Media has never owned or had any ability whatsoever to authorize who can access the Account. This alone defeats BH Media's claims under the Virginia Computer Crimes Act ("VCCA"), the Computer Fraud and Abuse Act ("CFAA"), and the Stored Communications Act ("SCA"), criminal statutes that provide civil remedies only against individuals who are not authorized to access either a computer or communications. *See* CFAA, 18 U.S.C. § 1030(a)(2) (creating claim against defendants who access computers either "without authorization" or who "exceeds authorized access"); SCA, 18 U.S.C. § 2701 (creating claim against defendants who access electronic communication facility "without authorization" or "intentionally exceed an authorization"); VCCA, Va. Code § 18.2-152.4, *et seq.* (creating claim when defendants act "without authority" or are "unauthorized" to access a computer). To prevail on any of these claims, BH Media must prove that it has the right to prohibit Bitter's access to the Account, making his use of it unauthorized. *See Oce N. Am., Inc. v. MCS Servs.*, 748 F. Supp. 2d 481, 487 (D. Md. 2010). BH Media had no such right because Bitter has always maintained personal ownership and control of the Account.

Courts in this District have broadly recognized the personal ownership of communications accounts, even when they contain the organization's name and are used as the official account in company business. In *Hoofnagle v. Smyth-Wythe Airport Comm'n*, 2016 U.S. Dist. LEXIS 67723 at *1-3 (W.D. Va. 2016), an airport employee created a Yahoo! email account, charliemkj@yahoo.com, which he used for both airport and personal business. The "mkj" letters in the email address reference the FAA identifier for the Airport, and the email address "was held out to the public as an official contact for the Airport" and was "the email address on file with the FAA and the Virginia Department of

20

Aviation." *Id.* at 3. Despite plaintiff's usage of the email address in the scope of his employment and on Airport computers and its reference to the Airport's FAA identifier, the court recognized that the "email account at issue was not owned or managed by the Airport." *Id.* The court thus focused on whether the plaintiff had authorized the Airport to access the account following his separation from employment, finding a fact dispute for whether the Airport had violated the SCA. *Id.* at 32-33.[15]

Even if BH Media owned the Account and had the ability to control whether Bitter is authorized to use it (which it does not), Bitter's reasonable belief that he owns the Account and is authorized to use it precludes liability. *See BHL Boresight, Inc. v. Geo-Steering Sols., Inc.*, No. 4:15-CV-00627, 2017 U.S. Dist. LEXIS 136227, at *24 (S.D. Tex. Aug. 24, 2017) (recognizing defendant's reasonable belief he was authorized to access computer could rebut CFAA intent requirement); *Snap-On Bus. Solutions Inc. v O'Neil & Assocs.*, 708 F Supp. 2d 669 (N.D. Ohio 2010) (same); *see also OpenRisk, LLC v. MicroStrategy Servs. Corp.*, 876 F.3d 518, 528 (4th Cir. 2017) (citations omitted) (interpreting the VCCA under a trespass framework to find an unauthorized user is not liable for violating the statute when they have "a sincere, although perhaps mistaken, good faith belief that one has some legal right to be on the property").

### D.    BH Media's Breach of Fiduciary Duties and Conversion claims fail.

BH Media's last ditch efforts to state catch-all common law conversion and breach of fiduciary duty claims are meritless because the Account was never BH Media's property. Bitter's use of the Account therefore violates no fiduciary duty to BH Media, and gives BH Media no standing to bring

---

[15] BH Media cites *Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 923-26 (E.D. Va. 2017). ECF No. 6, at 12. *Estes* is inapposite because the former employee "did not create the account unilaterally, but rather did so within the scope of his employment for, and at the direction of, [the company]" and did not use the google drive account for personal use. *Id.* at 925. Social media accounts, like Bitter's Account, which publicly identify the individual user, are readily distinguishable from private storage platforms like a google drive account, and courts have recognized that employees retain ownership interests in personal social media accounts which they use in the scope of their employment. *See e.g.*, *Maremont v. Susan Fredman Design Grp., Ltd.*, 2011 WL 6101949 at *1 (N.D. Ill. 2011) (denying cross-motions for summary judgment on claim that the *employer* violated the SCA when it made posts to the employee's Twitter account which she used for personal and work postings, and maintained her password on a work computer).

a conversion claim against Bitter.

Additionally, the conversion claim—asserting an ownership interest over aspects of the Account such as the "public feed of tweets" and the "login information to the Account"—fails because under Virginia law, "a cause of action for conversion does not encompass claims for interference with *undocumented* intangible property rights." *Darton Envtl., Inc. v. FJUVO Collections, LLC*, 2018 U.S. Dist. LEXIS 129482 at *16-18 (W.D. Va. 2018) (emphasis in original) citing *Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994) (While conversion typically applies to tangible property, the cause of action can include "intangible property rights which arise from or are merged with a document, such as a valid stock certificate, promissory note, or bond."); *Hinkle Oil & Gas, Inc. v. Bowles Rice McDavid Graff & Love LLP*, 617 F. Supp. 2d 447, 454 (W.D. Va. 2008) (explaining that when a "document symbolizes or embodies the right to property, conversion of the document includes conversion of the intangible rights represented in the document.") (internal citations omitted).

BH Media has not alleged that any intangible property rights it has in the Account, such as the login or access information, have been similarly documented in any way. In its Motion, BH Media cites some limited instances in which courts have allowed conversion claims to go forward for alleged misappropriation of copies of confidentially maintained electronic documents such as customer lists and trade secrets. (Dkt. 6 at 16) citing *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 2011 U.S. Dist. LEXIS 113702, 2011 WL 4625760, at *1 (E.D. Va. Oct. 3, 2011) (recognizing conversion claim for copies of confidential electronic documents allegedly taken by competitor). These precedents are completely inapposite. At no point has BH Media ever accessed any non-public portion of the Account, much less reduced it to a confidentially maintained document, electronic or otherwise. BH Media's attempt to expand the tort of conversion to the Account is an overreach.

22

### III. BH Media will not suffer Irreparable Harm.

BH Media argues it is entitled to injunctive relief because Bitter's possession of the Account endangers its "goodwill" with the followers of the Account, and *could* subject BH Media to a loss of subscribers. *See* ECF No. 6, at 19-20. This conclusory allegation cannot satisfy BH Media's weighty burden to show that it will be irreparably harmed absent injunctive relief. "Where the plaintiff seeks a preliminary injunction and argues its available remedies at law would be inadequate, the burden is on the plaintiff to provide some evidence and reasoned analysis for that inadequacy." *Hawk Advisers, Inc. v. Gillenwater*, 2018 U.S. Dist. LEXIS 84485 at *16-17 (W.D. Va. 2018) (citations omitted). This Court has recognized that a party must show "specific evidence concerning the actual or potential loss of business or goodwill" before the Court will find a showing of irreparable injury sufficient to enter a preliminary injunction. *RLI Ins. Co. v. Nexus Servs.*, 2018 U.S. Dist. LEXIS 110609 at *29 n.6 (W.D. Va. 2018); *See Hawk Advisers*, 2018 U.S. Dist. LEXIS 84485 at *16-17 (denying preliminary injunction and holding "conclusory claim that Plaintiff's brand loyalty and goodwill will suffer is wholly inadequate").[16]

Here, BH Media makes the conclusory and unsupported assertion that Bitter is harming its goodwill by maintaining ownership of the Account. ECF No. 6, at 18-19. By contrast, if Bitter's Account is taken from him, he will instantly lose the opportunity to communicate with his personal followers that he has personally connected with through his efforts over many years. As indicated by the vast majority of the public posts that people following this case have made, these individuals care about following Bitter, not the Times. *See* **Exhibit 11**, Selections of Public Comments. Therefore, even

---

[16] *See also Yellow Cab Co. of Charlottesville v. Rocha*, 2000 U.S. Dist. LEXIS 11597 at *13 (W.D. Va. 2000) ("Although the plaintiff alleges incalculable damages to its goodwill,…the plaintiff has failed to *specifically articulate* any irreparable harm that would tip the scales of the balancing test in the plaintiff's favor.") (emphasis added); *Robinson v. JoeyBra, LLC*, 2013 U.S. Dist. LEXIS 65786 at *11 (W.D. Va. 2013) ("Plaintiff has not produced any *specific evidence* regarding projected losses in profits, market share, customer goodwill, or other relevant considerations to support a showing of irreparable harm in this case.").

granting the relief BH Media seeks would not cure its alleged irreparable harm.

Finally, while BH Media claims irreparable harm, it has simultaneously muzzled its own reporters in a shameful attempt to manufacture damages. BH Media forbade its reporters from tweeting about Virginia Tech football in August and early September. Ex. 2, ¶ 26. Even now, Bitter's replacement Mike Niziolek is not permitted to tweet from his personal account, but only through the company-owned @SportsTRT account. *Id.* Such ill-conceived and self-destructive conduct demonstrates that BH Media is bringing this lawsuit out of anger for Bitter's decision to join a competitor rather than legitimate belief that it is being harmed.

## IV.    The Balance of the Equities favors Andy Bitter.

"The entire preliminary injunction inquiry, and particularly the requirement that the district court carefully balance the harms to the parties, is intended to ensure that the district court chooses the course of action that will minimize the costs of being mistaken." *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 284 (4th Cir. 2002)(internal quotation marks omitted). The balance of the equities favors Bitter; this is not a close call. If BH Media's requested relief is granted, Bitter will lose all of the benefits of his continuous efforts to post to the Account, growing its follower base from 4,000 to nearly 28,000 people who have enjoyed and benefitted from Bitter's Twitter commentary over the last seven years. In contrast, BH Media, whose only claim to his Account is a post-hoc, patently false narrative and nonexistent chain of title, has not customarily asserted an ownership interest in the Twitter accounts of its other reporters when, as BH Media expressly encourages, they use them to report breaking news and promote their work for the paper.

Further, BH Media maintains numerous avenues to promote its reporting of Virginia Tech athletics through social media, including the Times' branded Twitter and Facebook accounts, and the personal Facebook and Twitter accounts of the other reporters who cover Virginia Tech athletics. Rather than actually creating a Times Twitter account focusing on Virginia Tech Football, BH Media

has intentionally—though unsuccessfully—attempted to manufacture damages by instructing its writers to forego and later limit tweets about Virginia Tech football, to imply that Bitter's Account somehow has an exclusive ability to do so.

Tucker and Bitter are the *only* individuals that have ever had access to, controlled, and posted from the Account. Upsetting the status quo to give BH Media the Account plainly defies the balance of the equities and would serve an injustice on Bitter and his followers. In sum, BH Media's efforts to enjoy the benefit of Tucker's and Bitter's efforts to grow a personal Twitter account are contrary to equity, particularly in light of the tenuous legal theories and false factual premises on which its claims rely.

## V.    The Public Interest favors Andy Bitter.

Bitter does not dispute that the public has an interest in protecting ownership of assets and preserving the status quo with respect to those assets. *See* ECF No. 6, at 21-22. The only way to further that public interest, however, is to leave the Account with its rightful owner, Bitter. "There is a strong public interest in the ability of property owners to preserve and maintain their right to control [their property]." *Davilla v. Enable Midstream, LP*, 2018 U.S. Dist. LEXIS 46054 at *8 (W.D. Okla. 2018). "The right to exclude is 'perhaps the most fundamental of all property interests.'" *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 569 (S.D.N.Y. 2018) (discussing property rights associated with Twitter). Here, BH Media is seeking access and control over Bitter's personal Twitter account and seeks to impinge upon Bitter's property interests and right to exclude BH Media from accessing his Account. The public interest, therefore, is best served by preventing corporate entities, such as BH Media, from falsely asserting ownership and control over an employee's personal property solely to harass the rightful owner and gain a business advantage.

The public likewise has an interest in protecting employees' personal social media accounts from claims of corporate ownership, particularly when, as here, the employer failed to provide

employees with notice their personal accounts may be subject to a later claim of corporate ownership if used in connection with their employment. "[T]he Supreme Court has referenced the 'vast democratic forums of the Internet,' has described the internet (including social media platforms such as Twitter) as one of 'the most important places (in a spatial sense) for the exchange of views,' and has analogized the internet to the 'essential venues for public gatherings' of streets and parks." *Knight*, 302 F. Supp. 3d at 574 (internal citations omitted). Corporate ownership and control over employees' personal social media accounts—absent a clear agreement—will minimize the diversity of views expressed on social media because those accounts will no longer be controlled by a numerous and diverse set of employees, but by a single corporate entity. This has serious implications for the public and for the ability of individuals to express themselves without corporate oversight.

Finally, as evidenced by the lopsided support Bitter has received, *see* Ex. 11, Selections of Public Comments, the public also has an interest in Bitter's retention and continued control of his Account.

## **CONCLUSION**

For the foregoing reasons, Bitter respectfully requests that the Court deny BH Media's motion for preliminary relief because BH Media has not come close to making the clear and convincing showing required to upset the status quo and rob Bitter of his Account.[17]

Dated: September 17, 2018

Respectfully submitted,

/s/ J. Benjamin Rottenborn
J. Benjamin Rottenborn (VSB # 84796)
Joshua R. Treece (VSB # 79149)

---

[17] Pursuant to Federal Rule of Civil Procedure 65(c), a district court must fix a bond whenever it grants a preliminary injunction "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In the present case, BH Media alleges that it would take in excess of $150,000 to recreate the Account. Should this Court adopt BH Media's arguments to grant them the injunctive relief sought, it should follow its own estimate of the amount of potential harm and require them to pay a bond of $150,000.

Brooks A. Duncan (VSB # 87476)
WOODS ROGERS PLC
10 S. Jefferson St., Suite 1400
Roanoke, VA 24011
Telephone: (540) 983-7540
Fax: (540) 983-7711
brottenborn@woodsrogers.com
jtreece@woodsrogers.com
bduncan@woodsrogers.com

*Counsel for Defendant/Counterclaim-Plaintiff Andy Bitter*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 17th day of September, 2018, the foregoing Opposition to Plaintiff's Motion for a Temporary Restraining Order or Preliminary Injunction was filed electronically with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to counsel of record in this matter.

/s/ J. Benjamin Rottenborn
J. Benjamin Rottenborn